J-S35027-18

J-S35028-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.G.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.A. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 240 MDA 2018 |

Appeal from the Order Entered January 24, 2018
In the Court of Common Pleas of Cumberland County
Juvenile Division at No(s): CP-21-DP-0000187-2016

| | | |
|---|---|---|
| IN RE: ADOPTION OF: Y.G.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.A. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 241 MDA 2018 |

Appeal from the Decree Entered January 8, 2018
In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s): 141-ADOPT-2017

BEFORE: BENDER, P.J.E., PANELLA, J., and MURRAY, J.

MEMORANDUM BY PANELLA, J.    **FILED AUGUST 03, 2018**

  T.A. ("Father") appeals from the decree entered on January 8, 2018, in the Court of Common Pleas of Cumberland County, involuntarily terminating his parental rights to his daughter, Y.G.-A., born in June 2014 ("Child"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b) of the Adoption Act and from the order entered January 24, 2018, changing Child's permanency goal

to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[1] Father's court-appointed counsel has filed a petition for leave to withdraw as counsel and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). We grant counsel's petition, and affirm the order and decree.

Cumberland County Children and Youth Services ("CYS" or "the Agency") became involved with Child in October 2016. **See** N.T., 1/5/18, at 42. CYS involvement began when Child's mother, K.G. ("Mother"), brought Child's half-brother, A.G., to the hospital by ambulance. **See id**. A.G. had multiple hematomas to the face and forehead, and the injuries did not match Mother's explanation. **See id**. A.G. also had a broken right femur, a broken right tibia, a healing rib fracture, and a torn frenulum. **See id**., at 43.

On October 19, 2016, Child and A.G. were placed in the legal and physical custody of CYS. **See id**. The court entered an order for emergency protective custody on October 20, 2016.

CYS received another referral on October 21, 2016. **See id**. This referral related to Child, indicating she had bruising and a scab on her ear highly suggestive of physical abuse. **See id**. Child also had multiple cutaneous injuries in unusual locations. **See id**. The court adjudicated Child dependent on November 29, 2016.

---

[1] We have consolidated these appeals *sua sponte*. Counsel for Father filed a single brief and petition to withdraw in these cases.

On October 20, 2017, CYS filed a petition for a goal change permanency hearing, requesting Child's permanency goal be changed to adoption. On December 22, 2017, CYS filed a petition for involuntary termination of Father's parental rights. The trial court conducted the hearing on the petitions on January 5, 2018.  Prior to the hearing, the trial court appointed Marylou Matas, Esquire, as counsel and guardian *ad litem* for Child, who was three and one-half years old at the time of the hearing.[2] CYS presented the testimony of Sean Hamer, Father's probation officer; Sandra Gibson, the CYS case worker; and the foster mother. Father testified on his own behalf. Child's counsel presented the testimony of Mother and cross-examined Ms. Gibson, the foster mother, and Father.

By decree entered January 8, 2018, the trial court involuntarily terminated Father's parental rights to Child.[3] By order of court entered January 24, 2018, the trial court changed Child's permanency goal to

_____

[2] In **In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017) (plurality) (initially filed on March 28, 2017), our Supreme Court held that § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. With respect to this Court's holding in **In re K.M.**, 53 A.3d 781 (Pa. Super. 2012), that a GAL who is an attorney may act as counsel pursuant to § 2313(a) as long as the dual roles do not create a conflict between the child's best interest and legal interest, the **L.B.M.** Court did not overrule it. Here, we discern no conflict between Child's legal and best interests.

[3] Mother consented to the termination of her parental rights. The court terminated Mother's parental rights by order entered January 8, 2018.

adoption. Father's counsel filed timely notices of appeal, as well as concise statements of errors complained of on appeal.

Father's counsel, Michael J. Whare, Esquire, filed a petition for leave to withdraw as counsel and an **Anders** brief, which we must address before reviewing the merits of this appeal. Attorney Whare has complied with the mandated procedure for withdrawing as counsel. **See Santiago**, 978 A.2d at 361 (articulating **Anders** requirements); **Commonwealth v. Daniels**, 999 A.2d 590, 594 (Pa. Super. 2010) (providing that counsel must inform client by letter of rights to proceed once counsel moves to withdraw and append a copy of the letter to the petition). Father has not filed a response to counsel's petition to withdraw.

We next proceed to review the issues outlined in the **Anders** brief. In addition, we must "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." **Commonwealth v. Flowers**, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Counsel's **Anders** brief presents the following issues:

1. Did the [t]rial [c]ourt err as a matter of law and abuse its discretion in changing the goal for the child to adoption and terminating [Father]'s parental rights in that [Father] is able to provide the child with the essential parental care, control, and subsistence that the child needs in the very near future?

2. Did the [t]rial [c]ourt err in determining the best interest of the child would be served by terminating [Father]'s parental rights?

     3. Did the [t]rial [c]ourt err in not granting [Father]'s request for additional time to achieve his family service plan objectives?

***Anders*** Brief, at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> [T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012) (internal citations omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act. The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***See In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

We may affirm the court's decision regarding the termination of parental rights with regard to any *one* subsection of § 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Although the trial court focused its analysis on § 2511(a)(1),(2) and (b), we will discuss only subsections (a)(2) and (b).

Subsection (a)(2) provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

23 Pa.C.S.A. § 2511(a)(2).

- 6 -

> In order to terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)).

A parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re A.L.D.*, 797 A.2d at 337. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *See id*., at 340.

And with respect to incarceration, our Supreme Court has stated:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*In re Adoption of S.P.*, 47 A.3d at 830-831.

With respect to subsection (a)(2), the trial court explained Father's compliance with his service plan goals, and its finding of grounds for termination, in part, as follows:

> The [CYS] caseworker, Ms. Sandra Gibson, testified about the goals in [Father]'s permanency and family service plans and his adherence to those goals. The following goals were put in place: (1) to obtain and maintain stable housing; (2) to improve parenting skills and the parent/child relationship; (3) to obtain a drug and alcohol evaluation and remain drug and alcohol free; and (4) to refrain from any criminal activities and cooperate with the criminal justice system. Ms. Gibson testified that [Father] was not meeting any of his goals.
>
> [Father] has not been able to maintain stable, safe and appropriate housing in which to accommodate his daughter. In August 2017, [Father] gave a different address to his probation officer than he gave to the Agency caseworker, so it was unknown where he was residing. Prior to August 2017, the Agency was unable to locate [Father] because of his lack of response to outreach efforts. When [Father] did speak to the Agency caseworker, he informed her that he was living in an efficiency apartment that was unable to accommodate a child. [Father] was incarcerated in September 2017, and was still in jail at the time of the termination hearing.
>
> [Father] has been inconsistent in working to improve his parenting skills and maintaining contact with his daughter. [Father] participated in a FAST assessment on April 20, 2017, which recommended that he participate in the TIPS parenting program, complete a drug and alcohol evaluation, and cooperate with his probation conditions. After difficulty reaching [Father] to set up the first appointment, the first TIPS session was scheduled for June 29, 2017; the ABC caseworker went to an address where [Father] was supposed to meet him, but [Father] was not there. [Father] was eventually discharged from the TIPS program on August 1, 2017 after several failed attempts at communication. He was referred for supervised visitation through ABC, and had one supervised visit at the ABC facility on January 4, 2017; several attempts were made thereafter to schedule more visits, with no response from [Father]. He was discharged from the STEPS program on June 14, 2017 due to failure to schedule additional

appointments. The Agency made numerous attempts to engage [Father] in visitation with his daughter, but [Father] only showed up to visits at [CYS] twice, when he was already in the building for a court hearing. The only contact [Father] has had with Y.G.[-]A. since her dependency began is one supervised visit at ABC and two supervised visits at [CYS] following court hearings; he has not had any contact with her since September 18, 2017. Since [Father] has been incarcerated, he has not made any requests to have visitation with Y.G.[-]A., and has not attempted any other contact with the child through cards, letters, or phone calls to the Agency, the foster agency, or the foster parents.

[Father] has not met his goal of remaining drug and alcohol free. There were inconsistent accounts of whether [Father] had received a drug and alcohol evaluation while incarcerated. [Father] had a positive drug screen for marijuana in January 2017. [Father] was enrolled in the Restorative Sanctions program on May 12, 2017 for random drug testing, but was discharged from that program on June 30, 2017 after having missed seven appointments for testing without communication or excuse. On September 18, 2017, [Father] agreed to be drug tested following a court hearing; however, once the sample was to be collected, he refused to provide it. [Father] had a positive drug screen for marijuana and PCP at the time of his arrest on September 20, 2017 in relation to a DUI with children present in the vehicle. [Father] was not tested after that date due to his incarceration.

[Father] has also not met his goal of refraining from criminal activity. [Father] has had several sets of new charges since Y.G.[-]A. has been dependent, and was incarcerated in Dauphin County Prison at the time of the termination of parental rights hearing. [Father]'s probation officer, Mr. Sean Hamer, testified that [Father] is currently in violation of the conditions of his probation. On January 3, 2017 [Father] was arrested for being in possession of marijuana and drug paraphernalia and driving under suspension, and his probation was revoked. On April 16, 2017, [Father] was again arrested for two counts of possession of marijuana and drug paraphernalia. On September 20, 2017, [Father] was charged with: felony contraband controlled substance; two counts of child endangerment; possession of a small amount of marijuana; possession of drug paraphernalia; four counts of DUI; driving while license is suspended with a BAC of at least 0.02; careless driving; no rear lights; and two counts of failure to have restraint systems for children. [Father]'s blood

contained marijuana at the time of his arrest in January 2017, and contained PCP and marijuana at the time of his arrest in September 2017. If convicted of his current pending charges, a state sentence of incarceration would be recommended and it is unknown when [Father] would be eligible for release. He is currently set to have formal arraignment on his pending charges on April 6, 2018.

The Agency's primary concern is that due to [Father]'s criminal activities and not remaining drug and alcohol free, [Father] cannot provide a safe home for the child. The Agency is also concerned that [Father] has not made efforts to be in contact with the child or maintain stability in housing that could accommodate her. Although [Father] expresses an interest in having custody of his daughter, he historically has been uncommunicative with the Agency and as a result, is unable to have regular visitation with Y.G.[-]A. at the ABC facility, at [CYS], or in any other place. He also has not provided any financial or other form of support for the child since she has been in care.

*** 

Viewing the record as a whole, this [c]ourt agrees with the Agency's assessment that [Father] has not proven himself capable, thus far, of providing proper parental care, control, and subsistence to the child. Furthermore, [Father]'s failings in this regard are of a quality that ensures the child will remain in a state of instability for the foreseeable future should this [c]ourt not permit the child to move forward to be adopted by her foster parents. While [Father] testified to his commitment to being in his daughter's life and of his desire to care for the child on his own, the fact remains that [Father] has a demonstrated history of drug use and criminality, which is dangerous to any child in [Father]'s primary care. While [Father] has been provided with multiple chances and over a year to prove himself capable of providing safe and stable parental supervision for the child, he has not achieved that goal. At the time the termination petition was filed, approximately fourteen months had passed since Y.G.[-]A.'s placement with no real progress having been made toward reunification.

This [c]ourt found the Agency has shown, by clear and convincing evidence, that [Father] has refused or failed to perform his parental duties and that this refusal has caused the father not to be able to provide the essential parental care and control that

- 10 -

>the child needs for her well-being. There was nothing presented by [Father] to suggest that he would be able to provide the type of stability and care that the child needs within a reasonable time, and thus we found that the conditions that have caused the child to lack parental care, control, and subsistence will not be remedied within a reasonable time by the father.

Trial Court Opinion, 4/9/18, at 5-8, 13-14 (citations to record and footnotes omitted).

Our review of the certified record supports the trial court's factual conclusions and its finding of sufficient grounds for termination under subsection (a)(2). Following Child's removal from her mother's care, CYS implemented a family service plan. Father's service plan required Father to obtain and maintain stable housing. ***See*** N.T., 1/5/18, at 27. Father did not maintain stable and appropriate housing. ***See id***., at 28. Father's family service plan included improvement of parenting skills and parent child relationship, participation in TIPS, completing a drug and alcohol evaluation, and cooperating with the terms and conditions of his probation. ***See id***., at 30. After an extended period without contact from Father, Father was discharged from TIPS prior to the program starting. ***See id***. Father was referred for visitation. ***See id***., at 31. Father rarely saw Child while she was in her mother's care. ***See id***., at 79-84. After her removal from Mother's care in October 2016, Father had one supervised visit on January 4, 2017. Thereafter, Father had two supervised visits with Child following court hearings. ***See id***., at 32-33. Father did not request any visits after September

2017. *See id.*, at 41. Father has never sent anything to Child while Child has been in foster care. *See id.*, at 54.

CYS requested that Father participate in drug testing and signed Father up for such testing on May 12, 2017. They discharged him a little over a month later—after Father missed all seven calls for drug testing. *See id.*, at 32. Following a court hearing, CYS attempted to drug test Father, but he refused. *See id.*, at 32-33. Father's probation officer testified that Father failed at least two drug tests. *See id.*, at 21-22. Father violated his probation because of new criminal charges and failed drug tests. *See id.*, at 18-19. On September 20, 2017, Father was charged with felony contraband controlled substance; two counts of endangering the welfare of children; marijuana, small amount; drug paraphernalia; four counts of DUI; driving while suspended with a BAC of .02 or greater; careless driving; no rear lights; and two counts of failure to have restraint systems for children. *See id.*, at 19. At the time of the termination hearing, Father was incarcerated and awaiting trial.

"[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). The record substantiates the conclusion that Father's repeated and continued incapacity, neglect, and refusal has caused Child to be without essential parental control

or subsistence necessary for her physical and mental well-being. And Father cannot or will not remedy this situation. Thus, the record supports the findings of the trial court with respect to subsection (a)(2).

We next determine whether termination was proper under § 2511(b). This Court has stated that the focus in terminating parental rights under subsection (a) is on the parent, but it is on the child pursuant to subsection (b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. … [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some citations, brackets and quotation marks omitted; brackets added).

"[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal

bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

A parent's abuse and neglect are likewise a relevant part of this analysis. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008). And "a parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

The trial court found termination appropriate pursuant to subsection (b), explaining:

> This [c]ourt finds competent evidence in the record that it is in Y.G.[-]A.'s best interests to terminate [Father]'s parental rights and allow for her to be adopted by her current caregivers. The record contains testimony from multiple parties that Y.G.[-]A. and her caregivers have a strong bond and she is being appropriately cared for in their home. The caregivers are willing to maintain connections with the child's family if it is in her best interest[], and [are] planning to also adopt the child's natural brother. Additional time given to the father to prove himself able to provide proper parental care and control for the child would be inappropriate, as the child has already been in care for fourteen months and no significant progress toward reunification has been made. Though [Father] wishes to have custody of his daughter, he has not proven to the Agency or this [c]ourt that he is ready or willing to take on the responsibility of being a full-time caregiver. [Father]'s patterns of drug use, instability, lack of effort, and continuing criminality creates an intolerable danger to Y.G.[-]A. if [Father] were to regain custody of the child.

- 14 -

> At this point, Y.G.[-]A. needs stability and permanency that [Father] has proven he cannot provide. The foster family, on the other hand, have proven themselves capable of providing that stability, in addition to the love and security Y.G.[-]A. needs. This [c]ourt agrees with the Agency's position that it is in the best interest of the [c]hild to terminate parental rights and allow for adoption. The Agency has proven, by clear and convincing evidence, that it is in the best interests of the child to allow for a termination of parental rights under 23 Pa.C.S.A. §2511(b).

Trial Court Opinion, 4/9/18, at 15-16.

While discussing its decision to change Child's permanency goal to adoption, the trial court also noted that "there was sufficient opportunity for a parental bond to be created with the child and for Appellant to make significant progress on his service plan goals. As the record indicates, this did not happen." ***Id***., at 18. The trial court found Father "has not taken the steps to establish a bond with her, provide for her, or be her full-time parent." ***Id***. The trial court described Father as a "virtual stranger" to Child. ***Id***., at 19. The trial court's conclusions are supported by the record.

Child's foster mother, E.J. ("Foster Mother"), testified that she and her husband, S.J. (collectively, "Foster Parents"), are caring for Child and her brother. ***See*** N.T., 1/5/18, at 48. The children have lived with Foster Parents since October 2016. ***See id***., at 36. Child calls Foster Parents "mom" and "dad." ***Id***., at 48. The family watches TV together, sings, dances, and builds things together. ***See id***., at 48-49. Foster Parents love Child and are prepared to adopt her. ***See id***., at 51. Child is bonded to Foster Parents and is very comfortable in their care. ***See id***., at 36.

- 15 -

Father testified the only time he was not present in Child's life was when he was incarcerated. *See id*., at 57. Father indicated that during his visits he turned the television off and colored with Child. *See id*., at 64-65. Father believed he had a bond with Child because "she's happy to see me every time. Every time we have visits we color together … and clean up." *Id*., at 65. Father acknowledged only attending one visit with Child in the prior year, as well as two instances where he saw Child after court hearings. *See id*., at 63. Father blamed his lack of visitation on transportation issues. *See id*.

Father acknowledged he never lived with Child. *See id*., at 72. Mother testified that Father cared for Child only one or two times prior to Child being removed from Mother's custody in October 2016. *See id*., at 79-84. Father saw Child on only three occasions in 2017. *See id*., at 33. Ms. Gibson testified regarding a visit she observed in September of 2017. *See id*., at 34. At the visit, Father wanted to pick up Child. *See id*. Child wanted nothing to do with Father, and sat in the visit room and played and watched TV while Father was on his phone. *See id*. Ms. Gibson observed no quality interaction between Father and Child. *See id*. Foster Mother testified Child does not talk about Father, and Father "hasn't come up at all." *Id*., at 52. Father has not sent anything to Child and has not made any attempt to contact Child. *See id*., at 41, 54. Foster Mother did not believe that terminating Father's parental rights would have any negative effect on Child. *See id*., at 54.

- 16 -

Thus, as confirmed by the record, termination of Father's parental rights serves Child's developmental, physical and emotional needs and welfare and was proper pursuant to subsection (b).

Counsel's **Anders** brief also asserts the trial court erred in changing Child's permanency goal to adoption.

Our standard of review in a dependency case is as follows:

> [T]he standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion….

**In re L.Z.**, 111 A.3d 1164, 1174 (Pa. 2015) (internal citation and quotation marks omitted).

Regarding the disposition of a dependent child, § 6351(e), (f), (f.1), and (g) of the Juvenile Act provide the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S.A. § 6351(f)).

Additionally, the law requires the trial court to make a determination regarding the child's placement goal:

> **(f.1)    Additional    determination.**—Based    upon    the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> * * *
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.
>
> * * *

42 Pa.C.S.A. § 6351(f.1).

On the issue of a placement goal change, this Court has stated:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, the relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child.

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some internal citations, brackets, and quotation marks omitted).

The record reveals that a change of the permanency goal to adoption is in Child's best interest. Child is in a stable pre-adoptive home with her brother and is doing well. At the same time, Father failed to meet his service objectives, and has failed to maintain contact with Child. The trial court described Father as a virtual stranger to Child. As we find that the record supports the trial court's conclusion that the goal change was in the best interest of Child, we discern no abuse of discretion.

We also reject Father's argument the trial court erred in failing to give Father more time to achieve his family service plan objectives. The trial court concluded that giving Father additional time to meet his service plan goals would not be "appropriate or productive" given Father's failure to work "toward meeting the goals set out for him…" Trial Court Opinion, 4/9/18, at 13-14. We discern no abuse of discretion in the trial court's conclusion.

Based on the foregoing independent analysis of the trial court's termination of Father's parental rights and goal change to adoption, we agree with counsel for Father that the within appeal is wholly frivolous.[4] As such, we affirm the decree and order of the trial court, and grant counsel's petition to withdraw.

Decree and Order affirmed. Petition to withdraw granted.

_____

[4] Further, we note that our independent review of the record did not reveal any additional, non-frivolous issues overlooked by counsel.

J-S35027-18

J-S35028-18


Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/3/2018